## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CORWIN T. TELTSCHIK,     *

                       *

       Plaintiff-Appellant,   *

                       *

     v.                  *   Case No.:  12-7106

                       *

WILLIAMS & JENSEN, PLLC,  *

*et al.*                     *

                       *

       Defendants-Appellees.  *

---

*On Appeal from the*
*United States District Court for the District of Columbia (No. 1:08-CV-00089)*

---

# BRIEF FOR APPELLEES

John Tremain May  Bar #29204
JORDAN COYNE & SAVITS, L.L.P.
1100 Connecticut Avenue, NW
Suite 600
Washington, DC  20036
   Telephone:  202-496-2805
   Fax:  202-496-2800
   E-mail:  jmay@jocs-law.com
*Counsel for Defendants-Appellees, Williams*
*& Jensen, PLLC, Williams & Jensen, P.C.,*
*Barbara Wixon Bonfiglio and Meredith G.*
*Lesher (formerly Kelley)*

## ORAL ARGUMENT REQUESTED

Defendants-Appellees request that the Court schedule an Oral Argument on this appeal in accordance with FRAP 34 and Circuit Rule 34.  Although Defendants-Appellees believe that they have thoroughly addressed the facts and legal arguments in their Brief, they believe it would be helpful to the decisional process to respond to any questions the Court may have about the arguments presented.  Moreover, oral argument will allow the Defendants-Appellees to address any additional arguments that may be presented in Plaintiff-Appellant's Reply Brief.


 /s/ John Tremain May
John Tremain May  # 29204

## CERTIFICATE BY DEFENDANTS-APPELLEES
## AS TO PARTIES, RULINGS AND RELATED CASES

Defendants-Appellees, Williams & Jensen, PLLC, Williams & Jensen, PC, Barbara Wixon Bonfiglio, and Meredith G. Lesher, by counsel, hereby certify the following:

**Parties:**

This case was originally filed in the United States District Court for the Southern District of Texas and was subsequently transferred to the United States District Court for the District of Columbia.

The following parties appeared before the United States District Court for the District of Columbia (No. 1:08-CV-00089):

Corwin L. Teltschik

Williams & Jensen, P.L.L.C.,

Williams & Jensen, P.C.,

Barbara Wixon Bonfiglio,

Meredith G. Kelley (now Meredith G. Lesher), and

Robert J. Martinez.

The following parties appeared before the United States District Court for the Southern District of Texas (3:07-cv-00409):

The parties listed above, and

Don F. McGhan, II.

**Rulings under Review:**

The rulings under review are listed in Plaintiff-Appellee's Notice of Appeal.

**Related cases:**

Other than the lower courts described above, the case under review was not previously before this Court or any other Court.  There are no related cases of which counsel is aware.

**Rule 26.1 Disclosure:**

Williams & Jensen, P.L.L.C. is a Professional Limited Liability Corporation. It has no parent companies and no public companies hold a 10% or greater interest in the entity.

Williams & Jensen, P.C. is a Professional Corporation.  It has no parent companies and no public companies hold a 10% or greater interest in the entity.  It is the predecessor to Williams & Jensen, P.L.L.C.  Effective January 1, 2006, Williams & Jensen, P.C. transferred all assets to Williams & Jensen, P.L.L.C. and ceased to exist.

  /s/ John Tremain May
John Tremain May # 29204.

iv

# TABLE OF CONTENTS

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF FACTS .................................................................. 2

SUMMARY OF ARGUMENT ............................................................. 6

STANDARD

ARGUMENT ...................................................................................... 8

I. THERE WAS NEITHER AN AGENCY NOR AN
ATTORNEY-CLIENT RELATIONSHIP BETWEEN THE
ATTORNEYS AND TELTSCHIK IN HIS PERSONAL CAPACITY ........ 8

    A.    There Was No Agency Relationship Between the Attorneys
        and Teltschik in his Personal Capacity ................................. 9

    B.    There Was No Attorney-Client Relationship Between the
        Attorneys and Teltschik in his Personal Capacity ........................... 12

    C.    The Conciliation Agreement Had No Binding Effect
        on Teltschik, Because He Did Not Specifically Authorize
        the Signing of the Conciliation Agreement....................................... 13

II. THE TRIAL COURT CORRECTLY APPLIED THE JUDICIAL
PRIVILEGE TO TELTSCHIK'S DEFAMATION CLAIM ...................... 16

    A.    The Judicial Privilege Does Not Require a Showing
        of Adversity ....................................................................... 16

    B.    Federal Courts Are Required to Apply District of Columbia
        Substantive Law and Have No Power to Change that Law .............. 21

    C.    Certification Under D.C. Code § 11-723 Would Not
        Be Appropriate ................................................................... 25

    D.    This Court Should Not Consider This Issue As It Was
        Not Raised in the Trial Court ............................................. 27

III.    TELTSCHICK WAS NOT ENTITLED TO RECOVER
        REPUTATIONAL DAMAGES ON HIS CLAIMS FOR
        NEGLIGENCE AND BREACH OF FIDUCIARY DUTY ......................... 31

        A.    The Trial Court Correctly Ruled that Teltschik Could
              Not Recover Reputational Damages on his Claims of
              Negligence and Breach of Fiduciary Duty .......................... 32

        B.    The General Reputational Damages Sought in This Case
              Are Unique to Defamation Actions ...................................... 37

        C.    Teltschik's "But For" Analysis Does Is Irrelevant to the
              Question of Whether Such Damages Can Be Recovered
              in this Case   ....................................................................... 40

IV.     TELTSCHIK COULD NOT RECOVER PUNITIVE DAMAGES
        ABSENT A SHOWING OF THE REQUIRED MENTAL STATE ........... 41

        A.    Not Every Breach of Fiduciary Duty is Fraud .................... 42

        B.    Fraud Alone Will Not Support an Award of Punitive Damages ....... 43

        C.    Punitive Damages Cannot be Awarded in the Absence
              of a Culpable Mental State ................................................ 45

V.      THE TRIAL COURT PROPERLY DISMISSED TELTSCH'S
        REQUEST FOR A DECLARATORY JUDGMENT ................................. 48

VI.     THE TRIAL COURT PROPERLY EXCLUDED EXHIBITS
        AT THE PRETRIAL CONFERENCE .......................................... 53

        A.    The Prior Ruling Striking Allegations Directly Related
              to the Excluded Evidence ................................................... 53

        B.    The Trial Court Properly Excluded This Evidence ........................ 56

VII.    CONCLUSION .......................................................................... 59

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7) ................................ 60

## TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

**Cases:**

*Adams v. Bell*, 711 F.2d 161 (D.C. Cir. 1983) .................................................... 51

*Alliance for Democracy v. FEC*, 335 F. Supp. 2d 39 (D.D.C. 2004) ............... 50, 52

*\*Arneja v. Gildar*, 541 A.2d 621 (D.C. 1988) ......................................................... 17

*\*Ashcroft v. Mattis*, 431 U.S. 171 (U.S. 1977) ....................................................... 49

*Ashley v. Atlas Mfg. Co.*, 7 F.R.D. 77 (D.D.C. 1946),
*aff'd*, 82 U.S. App. D.C. 399, 166 F.2d 209 (D.C. Cir.1947) ................................ 13

*Borden v. Clement*, 261 B.R. 275 (N.D. Ala. 2001) .............................................. 19

*Bowie v. Maddox*, 642 F.3d 1122 (D.C. Cir. 2011) ............................................... 53

*\*Boynton v. Lopez*, 473 A.2d 375 (D.C. 1984) ....................................................... 44

*Brandenfels v. Day*, 316 F.2d 375 (D.C. Cir. 1963) ............................................. 50

*\*Bronson v. Borst*, 404 A.2d 960 (D.C. 1979) ................................................. 13, 14

*Brown v. Brown*, 75 S.E.2d 13 (Ga. 1953) ............................................................ 42

*Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102 (D.C. Cir. 2012)............................... 22

*BWX Electronics, Inc. v. Control Data Corp.*,
929 F.2d 707 (D.C. Cir. 1991) ............................................................................... 44

*Chatman v. Lawlor*, 831 A.2d 395 (D.C. 2003) .................................................... 43

*Colorado Milling & Elevator Co. v. Terminal R. Assoc.*, 350 F.2d 273 (8th Cir.
1965) ........................................................................................................................ 57

*Daka, Inc. v. McCrae*, 839 A.2d 682 (D.C. 2003)................................................. 46

*Dalo v. Kivitz*, 596 A.2d 35 (D.C. 1991) ................................................................ 44

*Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3,
96 S. Ct. 167, 46 L. Ed. 2d 3, (1975) ....................................................... 22

*District Cablevision Ltd. P'shp v. Bassin*, 828 A.2d 714 (D.C. 2003) ............. 41, 43

*\*District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077
(D.C. Cir. 1984) ....................................................... 28, 30

*Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749 (1985) .......................... 37

*Edmonds v. United States*, 436 F. Supp. 2d 28 (D.D.C. 2006) .............................. 35

*Erie R.R. v. Tompkins*, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938) ........... 21

*Essroc Cement Corp. v. CTI/D.C., Inc.*, 740 F. Supp. 2d 131 (D.D.C. 2010) ....... 43

*Estabrook v. Wetmore*, 529 A.2d 956 (N.H. 1987) .................................................. 9

*Federal Election Comm'n v. Committee
of 100 Democrats*, 844 F. Supp. 1 (D.D.C. 1993) ........................................... 12, 13

*Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*,
774 A.2d 332 (D.C. 2001) ................................................................. 16, 17

*Flax v. Schertler*, 935 A.2d 1091 (D.C. 2007) ........................................................ 14

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .................................................. 38

*Hanna v. Plumer*, 380 U.S. 460,
85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965) ....................................................... 22

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ........................................... 24

*Harrison v. Harrison*, 214 Ga. 393 (Ga. 1958) ...................................................... 42

*Harvey v. Mohammed*, 841 F. Supp. 2d 164 (D.D.C. 2012) ................................. 41

*Helvering v. Gowran*, 302 U.S. 238, 82 L. Ed. 224,
58 S. Ct. 154 (1937) ....................................................................................... 15

*In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998)........................................................ 10

*Jackson v. Culinary Sch.*, 27 F.3d 573 (D.C. Cir. 1994), *vacated on other grounds*, 515 U.S. 1139 (1995) ................................................................ 51, 52

*James v. Brown*, 637 S.W.2d 914 (Tex. 1982) ........................................................ 39

*Jonathan Woodner Co. v. Breeden*, 665 A.2d 929 (D.C. 1995)............................. 47

*\*Jorgensen v. Massachusetts Port Authority*, 905 F.2d 515 (1st Cir. Mass.1990)................................................................................................ 33

*Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993) .................... 26

*\*Kentucky v. Graham*, 473 U.S. 159 (1985) ....................................................... 5, 11

*King v. Kirlin Enters., Inc.*, 626 A.2d 882 (D.C. 1993)......................................... 41

*Kugel v. United States*, 947 F.2d 1504 (D.C. Cir. 1991) ....................................... 36

*Lawrence v. Grinde*, 534 N.W.2d 414 (Iowa 1995) .............................................. 32

*Makins v. District of Columbia*, 861 A.2d 590 (D.C. 2004)............................ 14, 15

*Miller v. Avirom*, 384 F.2d 319 (D.C. Cir. 1967) .................................................. 30

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 2013 U.S. Dist. LEXIS 149387 (D.D.C. Oct. 17, 2013)............................................................................... 52

*Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178 (5th Cir. 1975)....................................................................................................... 57

*Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005) ....................................................... 21

*Parker v. Stein*, 557 A.2d 1319 (D.C.1989) ........................................................... 47

*Partington v. Houck*, 723 F.3d 280 (D.C. Cir. 2013) .............................................. 8

*Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991) ........................... 52

*Pitt v. District of Columbia*, 491 F.3d 494 (D.C. Cir. 2007) ................................. 23

*Quinones v. United States*, 492 F.2d 1269 (3rd Cir. 1974) .................................... 34

*Railan v. Katyal*, 766 A.2d 998 (D.C. 2001) .......................................................... 43

*Railway Express Agency, Inc. v. Hill*, 250 A.2d 923 (D.C. 1969) ........................ 14

*Ross v. Gallant, Farrow & Co.*, 27 Ariz. App. 89, 551 P.2d 79 (1976)................ 33

*Sigal Construction Corp. v. Stanbury*, 586 A.2d 1204 (D.C. 1991)....................... 32

*Swish Mktg., Inc. v. FTC*, 669 F. Supp. 2d 72 (D.D.C. 2009)................................ 51

*Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997) ............................................ 16

*\*Tidler v. Eli Lilly & Co.*, 851 F.2d 418 (D.C. Cir. 1988) ................... 22, 23, 24, 26

*Washington Medical Center, Inc. v. Holle*, 573 A.2d 1269 (D.C. 1990) ............... 45

*Weiler v. Stern*, 67 Ill. App. 3d 179 (Ill. App. Ct. 1st Dist. 1978)......................... 18

*Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989)................................... 11

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (U.S. 1995)............................................. 48

*Wisconsin Ave. Associates, Inc. v. 2720 Wisconsin Ave. Cooperative Asso.*,
441 A.2d 956 (D.C. 1982) ...................................................................................... 43

*Zanville v. Garza*, 561 A.2d 1000 (D.C. 1989) ...................................................... 41

**Statutes:**

2 U.S.C. § 432(a) ...................................................................................................... 9

28 U.S.C. § 2201(a) ................................................................................................ 49

**Federal Rules:**

Fed. R. Civ. P. 57 ................................................................................ 49

Fed. R. Ev. 401 ................................................................................ 56

**Other Authorities:**

*70 F.R. 3 (Jan. 3, 2005) .......................................................................... 13

Testimony of John H. Pickering, S. Hrg. 99-824 (March 5, 1986) ........................ 27

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.    RESTATED ISSUES ONE, TWO, FIVE AND SIX:  WHETHER AN AGENCY OR AN ATTORNEY-CLIENT RELATIONSHIP EXISTED BETWEEN THE ATTORNEYS AND TELTSCHIK IN HIS PERSONAL CAPACITY.

II.   RESTATED ISSUES THREE AND FOUR:  WHETHER THE TRIAL COURT CORRECTLY APPLIED THE JUDICIAL PRIVILEGE TO TELTSCHIK'S DEFAMATION CLAIM.

III.  RESTATED ISSUE SEVEN:  WHETHER TELTSCHICK WAS ENTITLED TO RECOVER REPUTATIONAL DAMAGES ON HIS CLAIMS FOR NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

IV.   RESTATED ISSUE EIGHT:  WHETHER TELTSCHIK COULD RECOVER PUNITIVE DAMAGES ABSENT A SHOWING OF THE REQUIRED MENTAL STATE

V.    RESTATED ISSUE NINE:  WHETHER THE TRIAL COURT PROPERLY DISMISSED TELTSCH'S REQUEST FOR A DECLARATORY JUDGMENT

VI.   RESTATED ISSUE TEN:  WHETHER THE TRIAL COURT PROPERLY EXCLUDED EXHIBITS AT THE PRETRIAL CONFERENCE

## STATEMENT OF FACTS

This case arises out of the Attorneys' representation of a political action committee called Americans for a Republican Majority Political Action Committee ("ARMPAC"). ARMPAC, as used herein, refers to ARMPAC Federal which was distinct from ARMPAC Nonfederal. Dkt #40-1 at ¶4. Jt. App. ___. The Williams & Jensen law firm of Washington, D.C. was retained in 1994 by ARMPAC through its Executive Director, initially Karl Gallant and subsequently James Ellis, and retained annually thereafter to perform specific and limited tasks for ARMPAC, including filing and reporting to the Federal Election Commission ("FEC") and administrative obligations related to ARMPAC's bank accounts. William & Jensen was advised that Tom DeLay was the founder and Chairman of ARMPAC. *Id*. at ¶¶5-6. Jt. App. ___.

In 1995, ARMPAC decided to designate as its Treasurer a local individual from Congressman Tom DeLay's district in Texas, whose contacts and affiliations, particularly in Texas, would presumably foster the fundraising efforts of ARMPAC. *Id*. at ¶5. Jt. App. ___. Williams & Jensen did not solicit or select anyone but was advised by ARMPAC that Corwin L. Teltschik ("Teltschik") a Sugar Land, Texas attorney and friend of Tom and Christine DeLay had been asked and agreed to accept the Treasurer position and accordingly his name was substituted for that of Barbara Bonfiglio of Williams & Jensen, who was

2

designated as Assistant Treasurer. *Id*. at ¶8. Jt. App. ___. In accordance with

ARMPAC's instructions, Williams & Jensen's role in handling ARMPAC's FEC

compliance and other duties remained unchanged. *Id*. at ¶7. Jt. App. ___.

Teltschik apparently acquiesced in this arrangement, *see*, Dkt #1 at ¶ 7, Jt. App. at

___, as he had no involvement in any of the matters handled for the PAC by

Williams & Jensen over the next ten years. Dkt #40-1 at ¶11. Jt. App. ___.

Teltschik contributed to ARMPAC, and his contribution was duly reported to the

FEC, a fact that should have been obvious to him. Teltschik never complained or

raised any concerns (known to the Attorneys) about the respective roles of the

parties during his ten years as Treasurer. *Id*.

Teltschik has practiced law in Texas for more than thirty-five years and is

not unsophisticated. Dkt. #40-4 at 6-7. Jt. App. at ___. He benefited from his

assumption of the position of Treasurer and association with Tom DeLay.

Approximately ten years later, in 2005, in response to a complaint against

ARMPAC, filed by the Citizens for Responsibility and Ethics in Washington

("CREW") for possible violations of federal campaign law, the FEC opened Matter

Under Review ("MUR") No. 5675. *Id*. at ¶12. Jt. App. at ___. ARMPAC advised

Barbara Bonfiglio of Williams & Jensen that a Washington, D.C. attorney, Donald

McGahn, II ("McGahn") would be designated as counsel in MUR 5675. *Id*. at ¶13.

3

Jt. App. at ___.[1]  Bonfiglio notified Teltschik of the MUR and the need to

designate McGahn as counsel.  *Id*.  Teltschik refused to cooperate in signing the

designation form.  *Id*.  Bonfiglio signed the designation, and McGahn served as the

Respondents' counsel in MUR 5675 from that day forward, communicating with

the FEC directly.  *Id*. at ¶¶13-14.  Jt. App. at ___; Dkt #40-9, Jt. App. at ___; Dkt.

#40-10, Jt. App. at ___.

ARMPAC, represented by McGahn, and the FEC thereafter engaged in

informal methods of conciliation in Washington, D.C., and reached a "Conciliation

Agreement," executed in full as of July 19, 2006.  Dkt #40-5.  Jt. App. ___.  See

also, Dkt ##40-1 at ¶16, Jt. App. ___; 40-2 at ¶6, Jt. App. ___; 40-10, Jt. App. ___.

As part of that agreement, ARMPAC agreed to pay a civil penalty and take other

measures to ensure compliance with FEC regulations.  Dkt. # 40-5.  Jt. App. ___.

Williams & Jensen did not negotiate the Conciliation Agreement, or draft the

language of the agreement.  Dkt #40-1 at ¶16, Jt. App. ___; Dkt. # 40-2 at ¶6, Jt.

App. ___.  Ms. Bonfiglio had left Williams & Jensen by this time, and another

attorney at the firm, Meredith Kelley,[2] was contacted by ARMPAC's counsel,

McGahn and his employee James Tyrrell, III on behalf of ARMPAC, who

---

[1] Mr. McGahn was a defendant in the instant action but was dismissed from the case for lack of personal jurisdiction before it was transferred from Texas.

[2] Ms. Kelley has since changed her name to Lesher.  For clarity, we refer to her as Kelley in this Brief as that is the name that appears on the Conciliation Agreement.

4

expressly advised that the respective parties had fully agreed to the terms of the

Conciliation Agreement and that they needed her to sign and return it as soon as

possible.  Dkt #40-2  at ¶7.  Jt. App. ___.   Note that Ms. Kelly had not been

designated as either a Treasurer or Assistant Treasurer by ARMPAC, but Williams

& Jensen was still acting as ARMPAC's counsel on general FEC matters.

Reasonably understanding that ARMPAC's counsel in MUR 5675 was accurate in

its representations and authorized to make them, Kelly signed the Conciliation

Agreement and returned it to Mr. Tyrrell.  *Id.*

   In its style, the Conciliation Agreement referenced ARMPAC, and, as

required by the FEC, named the Treasurer, though only in his official capacity. Dkt

##40-5, Jt. App. ___; 40-6 at ¶10, Jt. App. ___.  The FEC always includes the

Treasurer in MUR proceedings as a pleading convention.  However, if the

Treasurer is personally suspected of malfeasance, he/she is named in his/her

personal capacity.  Naming the Treasurer in his/her official capacity is simply

another way of naming the political action committee.  Dkt #40-11 (citing,

*Kentucky v. Graham*, 473 U.S. 159 (1985) (discussing "official capacity" versus

"personal capacity" proceedings)), Jt. App. ___.

   Teltschik was never personally named as a Respondent, and was never

subjected to civil or criminal penalties relating to the complaint.  Dkt # 40-5, Jt.

App. ___.  Indeed, the FEC neither investigated nor sought any penalty against

Corwin Teltschik individually.  Teltschik never designated anyone as his

"personal" counsel in the MUR .  Rather, his name was recited in the MUR only in

his official capacity, *i.e.*, his "office" as Treasurer of ARMPAC, i.e., ARMPAC

itself.  See, Dkt ##40-5 at Sect. IV, ¶ 2, Jt. App. ___; 40-1 at ¶15, Jt. App. ___; 40-

2 at ¶5, Jt. App. ___; 40-4 at 72, Jt. App. ___; 40-6 at ¶¶10-12, Jt. App. ___.


## SUMMARY OF ARGUMENT

Defendants-Appellees, Williams & Jensen, PLLC, Williams & Jensen, P.C.,

Barbara Wixon Bonfiglio and Meredith G. Lesher (formerly Kelley) [hereinafter

referred to as "the Attorneys"] submit that this Court should affirm all of the

rulings challenged in this appeal.

As to the issue of an agency or attorney-client relationship between himself

and the Attorneys, Teltschik fails to acknowledge the dispositive difference

between representing the Treasure of a Political Action Committee in his official

capacity and representing that person in his individual capacity.  The Attorneys

owed no duties to Teltschik in his individual capacity and thus are not liable to him

personally for the claims asserted in his Complaint.

The trial court properly applied the Judicial Privilege to Teltschik's

defamation claim.  Teltschik's attempt to inject a new element of adversity into the

privilege should be rejected.  The law of the District of Columbia does not recognize such a requirement.

The trial court properly ruled that, because Teltschik's defamation claim was barred by the Judicial Privilege, Teltschik could not recover reputational damages by restating his defamation claim as a claim for negligence or breach of fiduciary duty.

Teltschik failed to make any showing of the mental state required to justify an award of punitive damages.  As a result, the trial court properly excluded such damages.

The trial court properly exercised its discretion in refusing to consider Teltschik's request for declaratory judgment.  The various declarations that he asked the Court to make did not involve an adjudication of a present right upon established facts.

Finally, the trial court properly excluded evidence at the Pretrial Conference that related to allegations that had previously been stricken.  Teltschik did not appeal the ruling striking those allegations.

# STANDARD OF REVIEW

The Order disposing of all remaining issues in this case, Dkt. #88, Jt. App.

___, was predicated on the trial court's prior summary judgment rulings.  Dkt #55.

Jt. App. ___.  The Court reviews summary judgments de novo and considers

evidence in the light most favorable to the non-moving party.  *Partington v.

Houck*, 723 F.3d 280, 285 (D.C. Cir. 2013).  This standard applies to Parts I, II, III,

and IV of the Argument, below.  The standards of review applicable to Parts V and

VI are specifically addressed in those Parts.

# ARGUMENT

I.     THERE WAS NEITHER AN AGENCY NOR AN ATTORNEY-CLIENT
RELATIONSHIP BETWEEN THE ATTORNEYS AND TELTSCHIK IN
HIS PERSONAL CAPACITY.

In the first part of his Brief, Teltschik argues that:  a) Bonfiglio and Kelley

were Teltschik's agents and attorneys; b) as agents and attorneys, they owed

certain duties to Teltschik; and c) as a result, the Attorneys are liable for all

damages caused by the breach of those duties.  Teltschik is wrong as to his initial

premise.  Moreover, as argued in Part III, below, even if Bonfiglio and Kelley did

owe duties to him personally, and breached those duties, the only damages sought

by Teltschik in this action were not recoverable as a matter of law.

A.     There Was No Agency Relationship Between the Attorneys and
       Teltschik in his Personal Capacity

As to an agency relationship, Teltschik argues that, because Bonfiglio and

Kelley signed ARMPAC checks and "handled its money," they were "Mr.

Teltschik's designated agents, as a matter of law; and Mr. Teltschik, as Treasurer,

was their principal."   Teltschik Brief at 24.  Throughout this case, Teltschik has

ignored the distinction between his position as Treasurer of ARMPAC, and the

interests of that office, and his personal interests.  Put simply, the Attorneys

represented ARMPAC and, with respect to certain activities, such as signing

checks, did so as agents of the office of the Treasurer.  See e.g. 2 U.S.C.

432(a)("No expenditure shall be made for or on behalf of a political committee

without the authorization of the treasurer or his or her designated agent.")  Their

duties at all times remained to the entity, ARMPAC, and not to any individual

serving as an officer of the entity.

The office of Treasurer of a PAC is somewhat *sui generis*.  An analogy to

the Treasurer of a corporation is imperfect.  Corporate officers generally have

limited liability for the actions they take in their official capacity.  Dkt. #40-11 at

4, n.4 (citing, *Estabrook v. Wetmore*, 529 A.2d 956, 958 (N.H. 1987) (applying

doctrine that acts of a corporate employee performed in his corporate capacity

generally do not form the basis for personal jurisdiction over him in his individual

capacity).  Jt. App. ___.   As a result, they cannot be sued for such actions and the

issue of their personal liability does not come up.  If they act *ultra vires*, then they

can be sued personally, but they are not being sued then in their official capacity

but in their personal capacity.  To represent such an officer in such a suit would be

to represent that person, not as Treasurer, but in his own personal capacity.

A better analogy can be drawn from the representation of a government

employee in that person's official capacity.  This distinction was made in *In re

Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998).  In that case, Ken Starr, acting as

Independent Counsel, sought to compel Bruce Lindsay, Deputy White House

Counsel and Assistant to the President, to respond to certain questions posed

during a hearing before a grand jury.  Lindsey asserted the attorney-client privilege

with respect to certain communications he had with the President.  The Circuit

Court ruled that the communications were not covered by the privilege.  In so

ruling, the Circuit Court stated that, "In Lindsey's case, his client -- to the extent he

provided legal services -- would be the Office of the President."  *Id*. at 1105.  The

Court first acknowledged that a government attorney-client privilege exists.  *Id*.

On the other hand the Court determined that the scope of that privilege was not as

broad as the private privilege.  *Id*. at 1108.  In other words, the fact that Lindsey

represented the office rather than the person resulted in a wholly different analysis

of the scope of the privilege.  By extension, Lindsey's duties to protect that

privilege were duties owed to the office, not the person.  The Court also noted that nothing prevents government officials who seek completely confidential communications with attorneys from consulting personal counsel.  *Id*. at 1112.

The analogy to this case is that the Attorneys represented the office of the Treasurer for ARMPAC and that Teltschik was free to secure his own personal counsel if he wanted to.  While Teltschik is not a government official, the analogy is appropriate, as the FEC drew a similar analogy when it issued its Policy Statement and cited cases involving Government officials.

> In the seminal case of *Kentucky v. Graham*, 473 U.S. 159 (1985), the United States Supreme Court discussed the distinction between official capacity and personal capacity suits. The Court determined that a suit against an officer in her official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Id*. at 165. In other words, an official capacity proceeding "is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). Accordingly, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Graham, 473 U.S. at 166. Therefore, in an official capacity suit, the plaintiff seeks a remedy from the entity, not the particular officer personally.

Dkt. #40-11 at 4.  Jt. App. ___.

B.     There Was No Attorney-Client Relationship Between the Attorneys and Teltschik in his Personal Capacity

As to an attorney-client relationship, Teltschik argues that he was personally retained and that the Conciliation Agreement bound him, personally, to carry out the obligations contained in the agreement.  He is wrong for two separate reasons. First, the case cited by Teltschik, *Federal Election Comm'n v. Committee of 100 Democrats*, 844 F. Supp. 1 (D.D.C. 1993), is completely distinguishable from Teltschik's case.  Second, Teltschik is bound by his own assertion that he did not authorize the signing of his name to the agreement, rendering the Conciliation Agreement unenforceable against him.

The *100 Democrats* decision involved a Treasurer of a Political Action Committee, Fusco, who signed a Conciliation Agreement with the FEC that required, among other things, the payment of a civil penalty of $3,500.  *Id*. at 3. More importantly, this agreement "unequivocally provides that Mr. Fusco may be held personally liable for the underlying civil penalty."  *Id*. at 6.  Because Fusco was subjected to personal liability in the Agreement, the Court did not reach the question of whether Mr. Fusco' status as treasurer of the defendant political committees subjected him to personal liability for correcting violations of the Act. *Id*. at 6.

12

A far different situation is presented in the instant case, for the ARMPAC Conciliation Agreement unequivocally states, "Corwin Teltschik is the treasurer of the Committee and is a respondent in this matter only in his official capacity as treasurer." Dkt. #40-5, at p. 2, ¶2. Jt. App. ___. Moreover, *100 Democrats* was decided before the FEC issued its policy statement to clarify the distinction between official and personal capacity. 70 F.R. 3, 4 (Jan. 3, 2005). Dkt. #40-11. Jt. App. ___. The ARMPAC Conciliation Agreement, on the other hand, was executed more than a year after the issuance of that policy statement. Dkt. #40-5. Jt. App. ___. It is therefore clear that Mr. Teltschik was not personally bound by the Conciliation Agreement.

C.      The Conciliation Agreement Had No Binding Effect on Teltschik, Because He Did Not Specifically Authorize the Signing of the Conciliation Agreement

Even if the Conciliation Agreement sought to expressly bind Mr. Teltschik in his personal capacity, his own assertion that he did not authorize the signing of his name to the Agreement, Dkt. #1 at ¶20, Jt. App. ___, prevents enforcement of the Agreement against him personally.

It has long been the law in the District of Columbia that, as a matter of law, an attorney has no right, without special authority, to make a compromise for his client. *Ashley v. Atlas Mfg. Co.*, 7 F.R.D. 77 (D.D.C. 1946), *aff'd*, 82 U.S. App. D.C. 399, 166 F.2d 209 (D.C. Cir.1947). This principal was reaffirmed in *Bronson*

13

*v. Borst*, 404 A.2d 960, 962 (D.C. 1979)(absent specific authority, an attorney cannot accept a settlement offer on behalf of a client), and in *Makins v. District of Columbia*, 861 A.2d 590 (D.C. 2004)(addressing issue of apparent authority).

The doctrine articulated in *Bronson* is different from another doctrine, not applicable to this case, that the acts and omissions of counsel are imputed to the client even though detrimental to the client's cause. *Railway Express Agency, Inc. v. Hill*, 250 A.2d 923, 926 (D.C. 1969). That doctrine deals with the conduct of litigation, rather than a separate agreement between the parties to resolve a matter. For example, in *Railway Express*, a dismissal for want of prosecution was upheld, despite the fact the dismissal was due to the attorney's neglect of the case. In *Flax v. Schertler*, 935 A.2d 1091 (D.C. 2007), the Court of Appeals ruled that counsel's description of plaintiff's claims was imputed to the client, despite the fact that the client later claimed that the description was faulty. The Court stated:

> Certainly, it is necessary for the "orderly conduct of litigation" that the trial court be able to rely on counsel's representations at important junctures of litigation (such as a summary judgment hearing) with respect to matters that are central to the represented party's case (such as what negligent omission the party is alleging).

*Id*. at 1103.

An agreement of settlement is not a representation by counsel in the litigation.  It is an extrajudicial action which, if made without the actual authority of the principal, cannot be enforced.

As stated in *Bronson* and *Makins*, the doctrine regarding authority to settle a case on behalf of a principal requires actual authority, either express or apparent. Teltschik has already conceded that Ms. Kelly did not have such authority.  Nor is there any suggestion in the record that Teltschik made any manifestations to the FEC that would cause it to believe that Kelley was so authorized.  *Makins*, 861 A.2d at 595.  For that reason, Plaintiff was not bound to the Conciliation Agreement and it is unenforceable against him.

In light of the fact that the Attorneys had no relationship as agents or attorneys with Teltschik in his personal capacity, they owed no duties to him in that capacity.  Thus, Teltschik had no basis to assert claims of negligence or breach of fiduciary duty against the Attorneys.  As a result, even if the Court disagrees with the other rulings of the trial court as to the judicial privilege, reputational damages or punitive damages, it is clear that Teltschik could not have recovered any damages from the Attorneys for allegedly breaching duties owed to him as either agents or attorneys.  *Helvering v. Gowran*, 302 U.S. 238, 82 L. Ed. 224, 58 S. Ct. 154 (1937)( A lower court decision must be affirmed if the result is correct despite the fact that the court "relied upon a wrong ground or gave a wrong

15

reason."); *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997). The Court should

thus affirm the dismissal of his claims for negligence and breach of fiduciary duty.

## II.     THE TRIAL COURT CORRECTLY APPLIED THE JUDICIAL PRIVILEGE TO TELTSCHIK'S DEFAMATION CLAIM.

Judge Kennedy dismissed the defamation claim against Ms. Kelley because

the claim was barred by the Judicial Privilege. Dkt. # 55 at 31-32. Jt. App. at

____.[3] Claiming that this is a question of first impression, Teltschik argues that, for

the judicial privilege to apply, the libel must be directed at an adversary in the

litigation. Teltschik Brief at 39. In short, Teltschik has added an "adversity

element" to the defense. Teltschik cites no authority from any jurisdiction in

support of this novel claim. Instead, he cites dicta from *Finkelstein, Thompson &*

*Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C. 2001) about

the "intent of the privilege."

### A.     The Judicial Privilege Does Not Require a Showing of Adversity

The Judicial Privilege applies if two elements are satisfied:

> (1) the statement must have been made in the course of or
> preliminary to a judicial proceeding; and

> (2) the statement must be related in some way to the
> underlying proceeding.

---

[3] As to Bonfiglio, Judge Kennedy ruled that Teltschik failed to provide any
evidence that she had any involvement with the preparation or execution of the
Conciliation Agreement. Dkt #55 at 31. Jt. App. ____.

*Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988).   It is obvious that a requirement

that the person being defamed be an "adversary" is not an element of the privilege

as it is recognized in the District of Columbia.   The statement quoted by Teltschik

from *Finkelstein* is dicta because that decision cites both *Arneja* and Section 586 of

the Restatement of Torts, quoted below, as authority for the requirements of the

privilege.  *Finkelstein*, 774 A.2d at 338.  Neither includes an adversity element in

its formulation of the privilege.

   Both *Finklestein* and *Arneja* cite the Restatement of Torts in describing the

scope of the privilege.  The adversity element proposed by Teltschik does not

appear in the Restatement's formulation of the privilege:

> An attorney at law is absolutely privileged to publish
> defamatory matter concerning another in communi-
> cations preliminary to a proposed judicial proceeding, or
> in the institution of, or during the course and as a part of,
> a judicial proceeding in which he participates as counsel,
> if it has some relation to the proceeding.

Restat. 2d of Torts, § 586 (1977).  Moreover, none of the Comments and

Illustrations to this section makes any reference to the status of the claimant as

client or non-client.

   In essence, Teltschik proposes to add another element to the formula for

establishing the affirmative defense of Judicial Privilege.  In so doing, he fails to

cite one case in the District of Columbia that has held or even suggested that this

17

adversity element is required to establish the privilege.    On the other hand, cases have been decided in other jurisdictions where a client sued his own attorney for defamation and the privilege was nevertheless applied.

In *Weiler v. Stern*, 67 Ill. App. 3d 179 (Ill. App. Ct. 1st Dist. 1978), Weiler brought a libel action against the Gottleib firm, which firm served as attorneys of record for five Illinois limited partnerships, owners of an apartment complex purchased from Michael Sparks. *Id*. at 180.  The plaintiff, Weiler, was the common general partner of the partnerships.   In addition, Gottlieb represented both the partnerships and many of the limited partners in two pending lawsuits. *Id*.

Gottlieb entered into settlement negotiations, seeking to resolve both pending suits, and proposed selling the partnerships' apartment complex to Sparks. A majority of the limited partners approved this proposed sale and authorized Weiler to enter into a contract of sale with Sparks.  Weiler, in his capacity as the general partner, refused to sell the property to Sparks and instead entered into an agreement with Kaler Enterprises, Inc. (Kaler). *Id*.

An allegedly libelous letter was sent by Gottlieb to each of the limited partners represented by Gottlieb's firm.  It was not sent to any persons who were not clients of Gottlieb.  In Gottlieb's opinion, the Kaler option contract was less advantageous to the limited partners than the proposed sale to Sparks, and the letter contained a lengthy discussion of the pros and cons of the two offers.  The letter

18

suggested various grounds for voiding the Kaler contract, including the fact that, in

Gottlieb's opinion, Weiler "was acting in his own self-interest and not in the best

interests of the partnerships" when he entered the contract with Kaler. The letter

also noted "[i]t would have been much easier for us to have remained silent and

allowed Mr. Weiler and Kaler Enterprises to take advantage of you."

Weiler sued Gottlieb for defamation. The issue addressed in that case was

whether the letter to Gottlieb's clients was written in connection with a legal

proceeding and whether it was pertinent thereto. *Id*. at 181. The Court found that

the statements in the Gottlieb letter which concerned Weiler were relevant to the

pending litigation and that the absolute privilege applied. *Id*. at 183. There is no

discussion of the fact that the privilege should not apply merely because Weiler

was general partner of the client partnerships, rather than an adversary of the client

partnerships.

In *Borden v. Clement*, 261 B.R. 275 (N.D. Ala. 2001), Borden sued his

attorney, Clement, for accusing Borden of being involved in a criminal conspiracy.

Clement had been Borden's friend, business partner, and personal lawyer since the

early 60s. *Id*. at 279. In fact, Clement was Borden's personal lawyer for all

relevant periods until November of 1991, when he accused Borden of being in a

criminal conspiracy. *Id*. At the time the statement was made, Clement also

represented Borden's business, DABCO, in a Chapter 11 bankruptcy proceeding in two adversary proceedings brought by a creditor. *Id*. at 280.

During the course of those proceedings, DABCO's Vice President, Jane Springer, discovered certain documents that appeared to show that Borden and his accountant, Flippo, were engaged in a conspiracy to defraud DABCO and its creditors. *Id*. at 281. Springer gave the documents to Clement, who turned them over to Anderson, the opposing counsel in the adversary proceedings.

A meeting was held on November 1, 1991, with Borden, Clement, Springer and Anderson in attendance. Borden was shown the notes and disclaimed any knowledge of them. He then offered to bring Flippo in to explain the notes. After a lunch break, Borden returned to the meeting with Flippo. Flippo acknowledged that the notes were his, and he proceeded to explain them. During Flippo's explanation, he was interrupted by Clement, who "announced in a loud and belligerent voice that this is a criminal conspiracy and that he was resigning as corporate lawyer." *Id*. at 282.

Borden sued Clement for defamation and other claims. The case was decided in accordance with Alabama law, which recognized an absolute privilege for communications made during legislative or judicial, or quasi-judicial proceedings. The district court granted summary judgment in favor of Clement, finding that the defamatory statement was related to the court proceedings. *Id*. at

20

285.  The court did not suggest that Clement's position as Borden's counsel in any

way undermined the applicability of the Judicial Privilege.

    As to his policy argument, Teltschik's focus is far too narrow.  The Judicial

Privilege does not apply only to attorneys.

> Treatises addressing this issue have indicated that the so-
> called judicial privilege applies to judges, court officers,
> attorneys, parties, grand and petit jurors performing those
> functions, witnesses and participants in judicial
> proceedings.

*Oparaugo v. Watts*, 884 A.2d 63, 79-80 (D.C. 2005)(citations omitted).

    The addition of an adversity element would ignore the broad scope of the

privilege, as it applies to persons (such as judges, witnesses and jurors) who clearly

are not adverse to any of the parties.[4]

    **B.**    **Federal Courts Are Required to Apply District of Columbia
    Substantive Law and Have No Power to Change that Law**

    In reality, Teltschik is trying change the law of judicial privilege as it exists

in the District of Columbia.  This case was filed in federal court under the court's

diversity jurisdiction.  As such, the court must apply the substantive law of the

District of Columbia.  *Erie R.R. v. Tompkins*, 304 U.S. 64, 82 L. Ed. 1188, 58 S.

---

[4] Teltschik takes the position that Ms. Kelly was acting as his attorney, he does not
address whether the privilege should apply if she was acting as an agent of
ARMPAC. Judge Kennedy addressed that possibility and noted that the privilege
also applies to parties, judicial officers, witnesses, and jurors.  Dkt. #55 at 32 n.25.
Jt. App. ___.  Teltschik does not appear to have challenged that aspect of the
Judge's ruling.

Ct. 817 (1938).[5]  "The 'broad command of Erie,' of course, is that 'federal courts are to apply state substantive law and federal procedural law' when sitting pursuant to their diversity jurisdiction."  *Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012)(citing, *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)).

A corollary to this command is the principal that the federal court has no power to change District of Columbia law.  This point was made clear in *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988):

> Judicial pioneers must no doubt make bold forays into terra incognita in order to chart the way to justice, but that is not the office of a federal court exercising diversity jurisdiction.  Ours is the more modest challenge, faithfully to apply the law of the state that the courts of the jurisdiction in which we sit, the District of Columbia, would apply had the case been filed with them.
> * * *
> Thus, we take the law of the appropriate jurisdiction as we find it; and we leave it undisturbed.

*Id*. at 424.  *See also Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S. Ct. 167, 168, 46 L. Ed. 2d 3, 5 (1975) ("A federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended

---

[5] As Judge Kennedy pointed out, the parties agreed that this case is governed substantively by District of Columbia common law.  Dkt. #55, at 15 n.9.  Jt. App. ___.

themselves to the State in which the federal court sits.")(applying conflicts of law rules); *Pitt v. District of Columbia*, 491 F.3d 494, 507 (D.C. Cir. 2007)("Of course, in considering common law claims, federal courts must apply existing law - we have no power to alter or expand the scope of D.C. tort law.").

In *Tidler*, the plaintiffs were daughters of women who had taken the drug known as DES during their pregnancies. The plaintiffs sued nine different drug companies but only went to trial against Eli Lilly. The other eight defendants were voluntarily dismissed. Although Eli Lilly was a manufacturer of DES, the plaintiffs conceded that they could not prove causation in the traditional sense, *i.e.*, that Eli Lilly had manufactured the DES that their mothers had taken during their pregnancy. At trial, the plaintiffs argued that the court should adopt one of several "non-identification" theories of liability that had been adopted in other states and did not require the plaintiffs to introduce this missing evidence. *Id*. at 421. The trial court declined and granted summary judgment to the defendant. The plaintiffs appealed to the United States Court of Appeals for the District of Columbia Circuit and again argued that one of the new theories of liability should be adopted.

The Circuit Court began its analysis by noting that the District of Columbia had not recognized any of the "non-identification" theories of liability, nor had plaintiffs cited any cases from that jurisdiction that could, in the aggregate, be said to mark a trend toward a more relaxed treatment of the causation requirement in

23

products liability cases. *Id*. at 423. On the other hand, the Circuit Court noted that the District of Columbia Court of Appeals had not explicitly rejected the specific theories advanced by plaintiffs. In fact, the Circuit Court surmised that if the District of Columbia Court of Appeals were to discard its "settled principles" it would "choose such a case as this to do so." *Id*. at 424. As such, the Circuit Court refused to accept the invitation to change established legal principles.

> It remains clear, however, that the theory that plaintiffs would have us "construct" requires that we build on a new foundation, not on the structural underpinnings of the traditional common law of torts. A common law decision having such a marked effect on the known public policy of the jurisdictions concerned, even if it is within the power of a state court, is surely beyond the authority of a federal court applying state law.

*Id*. at 424.

There is simply no basis for adopting Teltschik's proposed change in the law of judicial privilege. First, there are no recent opinions that lend support to Teltschik's proposed change in the law. Second, Teltschik cites no strong body of law from other jurisdictions adopting this proposed change.

On at least one occasion, this court has recognized a new cause of action not previously recognized by the D.C. Court of Appeals. See, e.g., *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), in which the Circuit Court recognized an

24

entirely new tort of aiding-abetting.[6]  In that case, however, the Court was making new law, not changing existing law.

> C.      Certification Under D.C. Code § 11-723 Would Not Be Appropriate

Moreover, the Attorneys submit that it would not be appropriate to certify a question under D.C. Code § 11-723 as to whether the elements of the Judicial Privilege should be changed.  Questions can be certified that may be determinative of the cause pending in the certifying court if "it appears to the certifying court there is no controlling precedent in the decisions of the District of Columbia Court of Appeals."  D.C. Code § 11-723(a).

As described above, the Circuit Court in *Tidler* refused to apply a theory of liability that did not require proof that the defendant actually caused the injury. Having determined that it did not have the authority to change District of Columbia law, the Circuit Court then considered whether it could certify the question to the District of Columbia Court of Appeals.  The Circuit Court stated that the most important consideration guiding the exercise of its discretion to certify such a question is whether the court "finds itself genuinely uncertain about a question of

---

[6] That decision has not been adopted by the District of Columbia Court of Appeals. *Flax v. Schertler*, 935 A.2d 1091, 1108 n.15 (D.C. 2007)("Although the Halberstam court predicted that this court would recognize a tort of aiding and abetting tortious conduct, we have not done so to date, and we are not bound by that court's ruling.")

state law that is vital to a correct disposition of the case before it." *Tidler v. Eli Lilly & Co.*, 851 F.2d at 426.  On the other hand:

> Where the applicable state law is clear, certification is inappropriate; it is not a procedure by which federal courts may abdicate their responsibility to decide a legal issue when the relevant sources of state law available to it provide a discernible path for the court to follow.

*Id*.  The Court noted that the law of the District of Columbia was not lacking in clarity and was not swayed by the fact that public policy considerations might convince the District of Columbia Court of Appeals to adopt the causation argument proposed by the plaintiffs.  Although the Court could not predict "with absolute certainty" that the local court would not adopt some new theory of liability, that was not the "relevant consideration; federal courts, sitting in diversity, are obligated to apply, not to amend, existing state law."  *Id*.

The Court also said that the condition of existing state law was "sufficient ground in itself" to refuse certification.  *Id.*  Although the Circuit court did certify a question of what appeared to be new law in *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993), that case can be distinguished in two ways.  First, the Circuit Court seemed to believe that both parties' positions were supported by prior authorities.  *Id*. at 563-64.  There are no prior authorities that establish the distinction the Teltschik intends to raise.  Second, this case can hardly be

considered one of extreme public importance in which the District of Columbia has a substantial interest, as was the case in *Joy*. *Id*. at 564.

The precedent in this case is clear and un-contradicted. There is no need for the District of Columbia Court of Appeals to reiterate the existence of that precedent or to clarify any conflicting precedents. The Judicial Privilege was correctly applied by Judge Kennedy in accordance with that precedent. Moreover, the Certification Statue is not a vehicle for changing local law in a federal court.

In addition, the legislative history of the certification statute in supports the Attorneys' position:

> Adoption of this proposal by the Congress would provide a means for obtaining authoritative resolution of undecided questions of D.C. law that may be determinative of proceedings pending in the certifying court.

Testimony of John H. Pickering,  S. Hrg. 99-824 (March 5, 1986).

This question of law has been decided. The cases are explicit in allowing the Judicial Privilege to apply without reference to the status of the parties. To rule otherwise would be to effect a change in the law.

> D.    This Court Should Not Consider This Issue As It Was Not Raised in the Trial Court

Finally, we note that Teltschik did not raise this issue below. Indeed, his argument below was inconsistent with the position he now takes.

27

It is well settled that issues and legal theories not asserted at the district court level ordinarily will not be heard on appeal. *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984). The Judicial Privilege was first raised in the Attorneys' Motion for Summary Judgment. In that Motion, the Attorneys argued that, "the statements in question here are contained within a Conciliation Agreement in a Matter Under Review ("MUR") before the Federal Election Commission and are therefore absolutely privileged and accordingly not actionable as a matter of law." Dkt. #40 at 21-22. Jt. App. at ___. The Attorneys cited *Finkelstein*, among others, and also argued that the "Protected Interest/Common Interest Privilege" barred the defamation claim. *Id*. at 25. Jt. App. at ___.

In his Opposition, Teltschik conceded, "As to the defendants' statements regarding privilege, as a general rule they are correct statements of the law." Dkt. # 45 at p. 22, ¶ 35. Jt. App. ___. Teltschik then addressed only the Common Interest Privilege:

> There is no protected interest / common interest privilege. Teltschik was an oblivious party to the proceeding, who had not authorized McGahn or anyone else to act for him. In light of the facts subsequently discovered by him, *his interests were adverse to those of the Defendants* and thereby to ARMPAC.

*Id*. at p. 22, ¶ 36 (emphasis added). Jt. App. ___. [7]

---

[7] Teltschik also argued, "As stated above, when an attorney enters an appearance without authority, the attorney is liable to the party for whom he entered his

This statement demonstrates that Teltschik ignored, in fact conceded, the Judicial Privilege argument. Having conceded that the Attorneys' statements regarding privilege were correct in general, he failed to offer any specific argument that would distinguish his case from any other. The Attorneys noted this fact in their Reply to the Opposition, "Plaintiff has completely dodged the issue of the four privileges which bar his claim – including the absolute privilege which applies, and each clearly bar his claims." Dkt. #48 at 12. Jt. App. at ___.

Equally important, Teltschik's statement that "his interests were adverse to those of the Defendants" undermines the position he wishes to take in this Court, that is, that a lack of adversity between himself and the Attorneys creates an exception to the general application of the Judicial Privilege.[8]

Judge Kennedy declared that, "Defendants are correct," in arguing that the alleged defamatory statements attributed to Ms. Kelley are shielded by the judicial and quasi-judicial proceeding privilege. Dkt. #55 at 31. Jt. App. at __. Although Teltschik filed a Motion to Rehear Judge Kennedy's Order, the Motion addressed only the issue of punitive damages. Plaintiff's Motion to Rehear the Granting of Summary Judgment on Punitive Damages. Dkt. #56. Jt. App. at ___.

---

appearance for all damages occasioned thereby." He cited an 1815 case from New Jersey for this proposition.

[8] The Attorneys assume, solely for the purposes of the appeal, that Teltschik's statement is correct. They do not adopt that statement for any other purpose.

In *Miller v. Avirom*, 384 F.2d 319 (D.C. Cir. 1967), this Court refused to consider issues that had not been raised in the district court.

> Canons of this tenor reflect, not obeisance to ritual, but "considerations of fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact." The injunction that trial ventilation precede appellate exploration best subserves that policy without appreciable imposition upon the litigants. "It requires them to deal fairly and frankly with each other and with the trial tribunal with respect to their controversies. It prevents the trial of cases piecemeal or in installments. It tends to put an end to litigation."

*Id.* at 322 (citations omitted); accord, *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984).

If Teltschik had raised this issue below, a more complete factual record could have been developed for review on appeal. The trial court might have called for an examination of the "adversity" if any that did exist between Teltschik and the Attorneys. We will never know, because this issue was not raised.

For all of these reasons, the Court properly granted summary judgment on Teltschik's claim for Defamation. The ruling below should be affirmed.

30

III.    TELTSCHICK WAS NOT ENTITLED TO RECOVER REPUTATIONAL
        DAMAGES ON HIS CLAIMS FOR NEGLIGENCE AND BREACH OF
        FIDUCIARY DUTY

The only damages Teltschik claimed in this case were general reputational

damages.  Although Teltschik initially claimed that he lost business as a result of

the damage to his reputation, he conceded he had no claim for lost profits damages.

See Transcript of June 20, 2012 at 8/21-23.  Jt. App. ___.  Dkt #88 at 4.  Jt. App.

___.

As discussed above, the trial court ruled that Teltschik could not recover

damages to his reputation pursuant to a claim for defamation because such claims

are subject to an absolute privilege.  In light of this holding, the trial court correctly

ruled that Teltschik could not recover damages for an alleged injury to his

reputation based on his claims of negligence and breach of fiduciary duty when he

was already barred from recovering these same damages in a defamation action.

Dkt. #93 at 2.  Jt. App. ___.  The trial court based its holding on the fact that the

only damages asserted at that point in the case were reputation damages.  *Id*.

These damages, in turn stemmed from the Attorneys' publication of the

Conciliation Agreement to a third party.  *Id*.  "[T]herefore the action sounds in

defamation and is not properly brought as a negligence or breach of fiduciary

duty." *Id*.

31

A.     The Trial Court Correctly Ruled that Teltschik Could Not Recover Reputational Damages on his Claims of Negligence and Breach of Fiduciary Duty

Teltschik cites no District of Columbia precedent that allows a party to pursue reputational damages in a non-defamation claim when those damages allegedly were caused by the publication of allegedly defamatory material. Nevertheless, some guidance on this issue can be found in *Sigal Construction Corp. v. Stanbury*, 586 A.2d 1204 (D.C. 1991). In that case, the plaintiff brought claims for defamation and negligence, among others, in connection with allegedly false statements made in an employment reference. After presentation of the plaintiff's evidence, the trial court granted defendant's motion for directed verdict on the count alleging negligence, specifically ruling that the negligence count was subsumed under the defamation count. *Id*. at 1208. The propriety of this ruling was not directly addressed in the subsequent appeal.

The majority of jurisdictions that have addressed this issue have refused to allow a plaintiff to sue for injury to reputation in the guise of a negligence claim. One such case is *Lawrence v. Grinde*, 534 N.W.2d 414 (Iowa 1995). In that case, the plaintiff sued his lawyers for negligence in filling out his bankruptcy schedules. Among other things, the plaintiff claimed that the alleged malpractice by his attorneys had damaged his reputation and sought compensation for those damages. The Court refused to allow such damages, holding, "Reputation damages are not a

32

legal remedy available in a damage action premised on a defendant's negligent act." *Id*. at 420.

The *Lawrence* case cites other decisions around the country that have arrived at the same conclusion, such as *Jorgensen v. Massachusetts Port Authority*, 905 F.2d 515 (1st Cir. Mass.1990). That case provides a lengthy examination of the reasons for not allowing reputational damages in negligence cases. Among other things, Jorgensen points out that some courts reason that it is not simply the element of injury to reputation that makes conduct sound in defamation. There also must be a communication, defined as conduct that brings an idea to the perception of others. *Id*. at 520. See, e.g., *Ross v. Gallant, Farrow & Co.*, 27 Ariz. App. 89, 551 P.2d 79 (1976):

> Defamation is the gist of the claim. Since it is, the legal rules which pertain to defamation apply. Common law negligence is not an alternative basis for recovery. This is not necessarily a result of logic; it is a product of the historical development of the law of defamation.

*Id*. at 82.

The trail court accepted this narrower interpretation, which was easily satisfied in this case, as the communication of the Conciliation Agreement to the public was the alleged source of Teltschik's alleged damages. In Paragraph 23 of his Motion to Reconsider, Teltschik stated, "Everything that the Defendants did, could and foreseeably did, result in damage to Mr. Teltschik's reputation through

33

the entry of the Conciliation Agreement." Dkt No. 89.[9]  *Jorgensen* does recognize

that a minority of jurisdictions have reached a different result, but in none of the

cases cited was there a determination that the negligent act resulted in the

publication of defamatory information that was protected by an absolute privilege.

Teltschik "suggests" that *Jorgenson* supports his ability to sue for damage to

his reputation.  Teltschik Brief at 43.  He follows this assertion with a lengthy

quote from the *Jorgenson* opinion.  There is nothing in the passage quoted by

Teltschik that supports his suggestion.  The quoted text focuses on the distinction

between a claim alleging injury to reputation arising out of a communication and a

claim alleging injury to reputation without such a communication and hence

without defamation.  This distinction provides no comfort to Teltschik, as he

conceded in his Motion to Reconsider that his damages all flow from the

publication of the Conciliation Agreement.  Dkt. #89 at ¶ 23.  Jt. App. ___.

Moreover, Teltschik makes no attempt to distinguish the other cases cited by the

Court in support of its position.

*Jorgensen* also cites, and rejects the reasoning of, *Quinones v. United States*,

492 F.2d 1269 (3rd Cir. 1974), a Third Circuit decision interpreting that part of 28

U.S.C. § 2680(h), that exempts the United States from claims brought under the

---

[9] While the Attorneys submit that this case falls within the narrower view adopted
by the trial court, they nevertheless continue to assert that the broader view
expressed in the *Jorgensen* decision is a correct interpretation of the law.

34

Federal Tort Claims Act that arise out of claims for libel or slander.  Frankly, the reasoning of this decision has more to do with the policies underlying the United States Government's reasons for waiving sovereign immunity under the Federal Tort Claims Act than with the policy reasons for allowing reputational injuries under common law claims other than defamation.  Nevertheless, to the extent that the issue raised in *Quinones* has some value, it is important to recognize that a different result has been reached in connection with that issue in this jurisdiction.

For example, in *Edmonds v. United States*, 436 F. Supp. 2d 28 (D.D.C. 2006), the plaintiff, claiming negligent disclosure of information about her, sued the United States under the Federal Tort Claims Act.  Specifically, the plaintiff brought claims for negligent disclosure, negligent endangerment, negligent infliction of emotional distress, and negligent interference with prospective economic opportunity. The Court dismissed all of these claims, holding:

> Claims, no matter how they are described by a plaintiff, based on dissemination of defamatory information pertaining to a federal investigation are barred by the libel/slander exemption. "[T]he label which a plaintiff applies to a pleading does not determine the nature of the cause of action which he states. And surely a litigant cannot circumvent the [FTCA] by the simple expedient of drafting in terms of negligence a complaint that in reality is a claim as to which the United States remains immunized."

*Id*. at 35 (citations omitted).

35

In reaching this decision, the Court relied on the earlier opinion of the D.C.

Circuit Court of Appeals in *Kugel v. United States*, 947 F.2d 1504 (D.C. Cir.

1991).  In that case, the plaintiff alleged that the FBI negligently initiated and

conducted an investigation of his business practices in North Carolina.  Although

Kugel was ultimately absolved of any criminal conduct, he claimed that, as a result

of the investigation, he was forced to declare bankruptcy and suffered stress related

seizures.  The District Court had granted a Motion to Dismiss, finding that Kugel's

suit fell within the excepting language of section 2680(h) of the FTCA and was

therefore barred. The Court of Appeals affirmed, stating:

> Here Kugel's complaint appears to allege a claim other
> than defamation. In assessing the nature of his claim,
> however, we must scrutinize the alleged cause of his
> injury.  It appears to us that the cause of Kugel's injury
> was not the FBI's negligent execution of the investigation
> but its dissemination of information associated with the
> investigation.

*Id*. at 1507.

To be sure, reputational damages are allowed in certain other kinds of

intentional torts, such as malicious prosecution and intentional infliction of

emotional distress, although we are not aware of a case where such damages have

been allowed where the injury arose out of publication of information that was

absolutely privileged.  Based upon the guidance found in *Sigal Construction Corp.*,

36

and the refusal to allow such damages in other jurisdictions, there is no reason to

suspect that the District of Columbia would allow such damages either.

      B.    The General Reputational Damages Sought in This Case Are Unique
              to Defamation Actions

      The trial court's ruling is also supported by the nature of defamation law and

the damages allowed in such actions.  While courts for centuries have allowed

juries to presume that some damage occurred from many defamatory utterances

and publications, *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 760-761

(1985), such "general damages" appear to be unique to the law of defamation.

> At common law, general damages have traditionally been
> awarded not only for harm to reputation that is proved to
> have occurred, but also, in the absence of this proof, for
> harm to reputation that would normally be assumed to
> flow from a defamatory publication of the nature
> involved.  This presumption of general damage to
> reputation from a defamatory publication that is
> actionable *per se* affords little control by the court over
> the jury in assessing the amount of damages.

Restatement 2d of Torts, Chapter 27 - Measure of Damages in Actions for

Defamation, § 621, comment a.

      In general tort law, damages that do not involve pecuniary loss are not

recoverable, with two specific exceptions not applicable to this case:

> Compensatory damages that may be awarded without
> proof of pecuniary loss include compensation
> (a) for bodily harm, and
> (b) for emotional distress.

Restatement 2d of Torts, Chapter 47 - Damages, § 905.

In addition, general damages have long been the subject of constitutional restrictions. *See, e.g., Gertz v. Robert Welch, Inc*., 418 U.S. 323 (1974). Yet, there is no well-developed body of law applying the same restrictions to reputational damages allowed in other common law claims. This is so because general damages to reputation are confined solely to the law of defamation. Because Teltschik's defamation claim has been barred, general damages are not available to him in the guise of some other tort.

The inappropriateness of Teltschik's claim for reputational damages in a non-defamation case is made manifest when one recognizes that Teltschik is alleging that the Attorneys negligently damaged his reputation through publishing a document, the Conciliation Agreement, that falsely accused him of a violation of FEC law. This is no different than alleging that the Attorneys negligently libeled Teltschik. In this instance, the addition of the word "negligent" is mere surplusage. But for the absolute privilege, Teltschik could sue for damage to his reputation without regard to the level of intent manifested by the Attorneys in publishing the allegedly defamatory remarks. Teltschik's approach would lead to the absurd result that the intentional publication of a falsehood that was subject to the absolute privilege would be nonactionable, whereas the negligent publication

of the same falsehood subject to the same privilege would be actionable merely by labeling the claim as one for negligence rather than libel.

There is no precedent in the District of Columbia setting forth this obvious proposition for the simple reason that no lawyer has yet tried (at the appellate level) to circumvent the absolute privilege in this fashion. For these reasons, the Attorneys submit that the trial court correctly ruled that Teltschik could not claim reputational injury damages in connection with the claims that remained in the case.

Teltschik argues that "the unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law," Teltschik Brief at 42, for which he cites *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982). That case has nothing to do with the issue presented to this Court. Instead, *James* involved a claim that a negligent diagnosis of incompetency by the defendant psychiatrists led to the involuntary commitment of the plaintiff. The Court ruled that the communication of the diagnosis was privileged, but the negligent diagnosis itself could be the subject of other claims. *Id*. at 917. In that case, however, there was no mention of a claim for damages to reputation. As a result, this case has nothing to do with the principle discussed above.

39

C.      Teltschik's "But For" Analysis Does Is Irrelevant to the Question of
         Whether Such Damages Can Be Recovered in this Case

Teltschik also challenges the trial court's dismissal of the defamation claim

against Ms. Bonfiglio by arguing that the court did not properly engage in a "but

for" analysis.  Teltschik Brief at 42-43.  Essentially, he claims that prior acts by

Ms. Bonfiglio led to the filing of the MUR which ultimately led to the filing of the

Conciliation Agreement.  This argument leads inevitably to the same place, that is,

that Teltschik's reputation was damaged by the publication of the Conciliation

Agreement, which is subject to an absolute privilege.  In Paragraph 23 of his

Motion to Reconsider, Teltschik states, "Everything that the Defendants did, could

and foreseeably did, result in damage to Mr. Teltschik's reputation through the

entry of the Conciliation Agreement."  Dkt. No. 89.  The trial court correctly found

that Ms. Bonfiglio had no involvement in the entry of the Conciliation Agreement,

and Teltschik does not challenge that particular finding.  Teltschik Brief at 42.

Finally, the Attorneys submit that Teltschik cannot recover for an alleged

loss of reputation if the alleged injury could result only from a misunderstanding of

the Conciliation Agreement.  Implicit in Teltschik's damage argument is the

presumption that potential clients read the Conciliation Agreement and inferred

from the Agreement that Teltschik was personally responsible for the violations

alleged in the Agreement.  As shown in Part I, above, any such inference would be

incorrect as a matter of law because Teltschik was not named by the FEC in his

personal capacity.  Teltschik, himself a lawyer, simply ignores this distinction.

For all of these reasons, the decision below on the issue of reputational

damages should be affirmed.

## IV.    TELTSCHIK COULD NOT RECOVER PUNITIVE DAMAGES ABSENT A SHOWING OF THE REQUIRED MENTAL STATE

"Punitive damages are a form of punishment," and are "to be awarded only

in cases of outrageous or egregious wrongdoing."  *District Cablevision Ltd. P'shp*

*v. Bassin*, 828 A.2d 714, 725 (D.C. 2003).  Punitive damages are disfavored under

D.C. law, and this "is reflected in the aggravated nature of the defendant's conduct

(and, inferentially, state of mind) that must be shown to justify an award."  *King v.*

*Kirlin Enters., Inc.*, 626 A.2d 882, 884 (D.C. 1993).  "A showing of negligence—

even gross negligence—is insufficient to support an award of punitive damages."

*Harvey v. Mohammed*, 841 F. Supp. 2d 164, 180-181 (D.D.C. 2012).  "Rather,

punitive damages are reserved for only those tortious acts that are replete with

malice."  *Id*. at 181 (quoting *Zanville v. Garza*, 561 A.2d 1000, 1002 (D.C. 1989)).

In this case, the District Court held that punitive damages could not be

awarded because there was no showing of "malice or its equivalent."  Importantly,

Teltschik does not argue that the Attorneys acted with "malice or its equivalent."

Instead, he merely argues that he was not required to plead, or even prove malice

41

in order to be entitled to recover punitive damages from the defendants.  Teltschik

Brief at 50.

In particular, Teltschik argues that he is entitled to recover punitive damages

because "[b]reach of fiduciary [sic] is a fraud," and "[f]raud will support the award

of punitive damages without the pleading of a mental state."  Teltschik Brief at 20.

Note that Teltschik did not assert a cause of action for fraud in his Complaint.  Dkt.

#1.  Jt. App. ___.   Likewise, in his restatement of "Issue No. 8," Teltschik asserts:

> In the District of Columbia, fraud will support the award
> of punitive damages without the allegation of a culpable
> mental state.  Since a breach of fiduciary duty is a fraud
> upon the principal, the allegation of a breach of fiduciary
> duty will support the award of punitive damages.

Teltschik Brief at 46.  Jt. App. ___.

A.     Not Every Breach of Fiduciary Duty is Fraud

Teltschik cites two decisions of the Supreme Court of Georgia, *Harrison v.*

*Harrison*, 214 Ga. 393 (Ga. 1958) and *Brown v. Brown*, 75 S.E.2d 13 (Ga. 1953),

to show that "any breach of the duty of loyalty and good faith by an agent to his

principal is fraud."  Teltschik Brief at 46.  Both cases held that a fiduciary who

improperly seeks to divest his principal of property is guilty of fraud.  But neither

case dealt with punitive damages, and neither case was decided under D.C. law.

There is no basis for Teltschik's conclusion that every breach of fiduciary

duty is fraud under D.C. law.  For example, in *Wisconsin Ave. Associates, Inc. v.*

42

*2720 Wisconsin Ave. Cooperative Asso*., 441 A.2d 956, 961 (D.C. 1982), the trial

court found that the breach of fiduciary duty did not rise to the level of fraud.  It

does not appear that this finding was reviewed on appeal.

B.    Fraud Alone Will Not Support an Award of Punitive Damages

Teltschik asserts that punitive damages are available whenever fraud is

alleged.  That is not currently the law in the District of Columbia.  "At one time it

was thought that fraud alone could serve as a basis for punitive damages. . . .

[M]ore recent cases on the subject make clear, however, that evidence over and

above what is required to establish the underlying tort is necessary for punitive

damages."  *Chatman v. Lawlor*, 831 A.2d 395, 400, n.8 (D.C. 2003) (internal

citations and quotations omitted).  "Specifically, the defendant's fraudulent

conduct must be accompanied by outrageous conduct such as maliciousness,

wantonness, gross fraud, recklessness and willful disregard of another's rights."

*Essroc Cement Corp. v. CTI/D.C., Inc*., 740 F. Supp. 2d 131, 147 (D.D.C. 2010)

(emphasis added).  *See Railan v. Katyal*, 766 A.2d 998, 1012 (D.C. 2001) ("In

cases where the underlying tort has been fraud, we have required, for punitive

damages, that the tort be aggravated by evil motive, actual malice, deliberate

violence or oppression.").  In other words, fraud is not sufficient—gross fraud is

required.  *See District Cablevision*, 823 A.2d at 725-726 ("in the absence of gross

43

fraud or comparable wrongdoing, proof of even intentional misrepresentation may not suffice to justify punitive damages").

For example, in *BWX Electronics, Inc. v. Control Data Corp*., 929 F.2d 707, 713 (D.C. Cir. 1991), the court upheld "the District Court's determination that BWX was required to demonstrate aggravating circumstances beyond mere fraud in order to support its plea for punitive damages."  In that case, the defendant agreed to negotiate exclusively with BWX, but was allegedly in contact with another buyer at the same time.  The court held that even though the defendant was found liable for fraud, punitive damages could not awarded without a showing of aggravating circumstances.  *Id*.

Likewise, a breach of fiduciary duty will not give rise to punitive damages in the absence of a culpable mental state.  Thus, in *Dalo v. Kivitz*, 596 A.2d 35 (D.C. 1991), involving allegations of legal malpractice and breach of fiduciary duty, the court refused to award punitive damages because "the conduct did not rise to the level of willful or reckless or malicious disregard of [the defendant's] rights."  *Id*. at 40.  While recognizing "varying formulations in our decisions," the court concluded that punitive damages cannot be awarded without a showing of culpable intent.  *Id*. at 41.

Similarly, in *Boynton v. Lopez*, 473 A.2d 375 (D.C. 1984), an attorney was held liable for malpractice and fraud because he induced his client to accept a

44

settlement offer by misrepresenting the nature of the offer.  Nonetheless, the court

overturned the punitive damages award.  Even though the defendant had made an

intentional misrepresentation, the tortious act was not "willful and outrageous" and

did not "result in gross fraud."  *Id*. at 377.  The court emphasized "that when

considering the appropriateness of a punitive damages award, lawyers are to be

treated as anyone else."  *Id*. at 378, n.1.  Therefore, "for punitive damages, actions

do not become more egregious simply because of the professional obligations of

the person committing them." *Id*. at1288.

In short, Teltschik's position that punitive damages are available whenever

fraud is alleged is simply incorrect.

C.     Punitive Damages Cannot be Awarded in the Absence of a Culpable
       Mental State

Teltschik's argument appears to be grounded on *Washington Medical*

*Center, Inc. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990), in which the court listed

fraud as one of the factors that will support an award of punitive damages.

However, *Washington Medical Center* plainly does not stand for the proposition

that punitive damages can be awarded without a culpable mental state.  In that

case, the managing general partner of a real estate investment partnership filed a

baseless lawsuit against Henry Holle, one of the other partners.  The lawsuit was

filed in order to retaliate against Holle for questioning the management of the

45

partnership, and to intimidate him from raising further objections. The court found that this lawsuit was "the culmination of a series of acts marked by refusal to acknowledge Holle's undisputed rights, efforts to exact unwarranted concessions from him, and an intent to coerce him into abandoning his inquiry into [the managing general partner's] practices." Therefore, punitive damages were appropriate. The court emphasized that "[w]hether punitive damages will lie depends on the intent with which the wrong was done," and "the required mental state for punitive damages often must be inferred from the totality of the parties' behavior." *Id*. at 1284, 1288.

The other three cases cited by Teltschik are similarly unavailing. In each case, the court focused on the defendant's state of mind, and did not even discuss whether the defendant's conduct met the technical definition of fraud. In *Daka, Inc. v. McCrae*, 839 A.2d 682, 696 (D.C. 2003), the defendant "flagrantly ignored plaintiff's pleas for help in the work place" and "the wrongdoing inflicted upon the plaintiff was severe and was exacerbated by the defendant's failure to conduct even a rudimentary investigation into the allegations of harassment." The court said the plaintiff could recover punitive damages only by showing "conduct and a state of mind evincing malice or its equivalent." *Id*. at 695. In that case, "the evidence of malice or reckless indifference on Daka's part was fully sufficient to sustain an award of punitive damages." *Id*. at 696.

46

In *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 931 (D.C. 1995), the defendant landlord was accused of ignoring housing code violations and intimidating tenants in order to convert the premises from rental to condominium use. The court held that "the jury must be instructed that punitive damages may be awarded only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." *Id*. at 938.

Finally, in *Parker v. Stein*, 557 A.2d 1319, 1321 (D.C.1989), the plaintiff alleged that Al Stein, his former landlord and employer, "ordered an associate to remove all of [the plaintiff's] earthly possessions from his apartment, which was undergoing renovation, and deposit them in the trash." The plaintiff was unable to retrieve any of his possessions before they were taken away by a garbage truck. The plaintiff further alleged that Stein threatened to "contact his 'friends' from Baltimore . . . about 'taking out a contract' on him." *Id*. The court held that on these facts, punitive damages were appropriate, because ill will, recklessness and a willful disregard of Parker's rights could reasonably be inferred from Stein's actions. *Id*. at 1322.

Teltschik's position that he was not required to plead, or even prove, malice in order to be entitled to recover punitive damages from the defendants has no

support in the case law of this jurisdiction.  As a result, the ruling below on the

issue of punitive damages should be affirmed.

## V.     THE TRIAL COURT PROPERLY DISMISSED TELTSCH'S REQUEST FOR A DECLARATORY JUDGMENT

"[T]he Declaratory Judgment Act has been understood to confer on federal

courts unique and substantial discretion in deciding whether to declare the rights of

litigants."  *Wilton v. Seven Falls Co*., 515 U.S. 277, 286 (U.S. 1995).  The Act

"confers a discretion on the courts rather than an absolute right upon the litigant."

*Id*. at 287.  Therefore, the trial court's decision is reviewed for abuse of discretion.

*Id*. at 290.

The trial court dismissed the claim for declaratory judgment based on the

arguments set forth in the Attorneys' Motion to Dismiss. The Attorneys made two

arguments in that Motion: First, "Plaintiff does not seek a declaration of his rights

or legal status under a contract or law, but rather asks the court to declare various

factual assertions–an improper basis for declaratory relief."  Dkt #10 (Tex) at p.

24.  Jt. App. ___.  Second, "the Court, in its discretion, should decline jurisdiction

over any declaratory judgment claim."  *Id*.  Teltschik was specifically asked to

address these arguments at a hearing on the Motion to Dismiss, but failed to do so.

Transcript of July 15, 2008, at 23.  Jt. App. ___.  The trial court's decision was

correct and should be affirmed.

48

The Declaratory Judgment Act[10] provides:

> In a case of actual controversy within its jurisdiction, . . .
> any court of the United States, upon the filing of an
> appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be
> sought. Any such declaration shall have the force and
> effect of a final judgment or decree and shall be
> reviewable as such.

28 U.S.C. § 2201(a).  Likewise, under Fed. R. Civ. P. 57, "The existence of

another adequate remedy does not preclude a declaratory judgment that is

otherwise appropriate. The court may order a speedy hearing of a declaratory-

judgment action."

The Declaratory Judgment Act does not abrogate the constitutional "case or

controversy" requirement.  "For a declaratory judgment to issue, there must be a

dispute which calls, not for an advisory opinion upon a hypothetical basis, but for

an adjudication of present right upon established facts." *Ashcroft v. Mattis*, 431

U.S. 171, 172 (U.S. 1977)(per curiam).  "Emotional involvement in a lawsuit is not

enough to meet the case-or-controversy requirement; were the rule otherwise, few

cases could ever become moot." *Id*. at 173.  In *Ashcroft*, the plaintiff's son was

---

[10] In his Opposition to the Attorneys' Motion to Dismiss, Teltschik cited the Texas
Uniform Declaratory Judgments Act.   However, the Texas statute does not apply
in federal court.  See Redwood Resort Props., LLC v. Holmes Co., 2007 U.S. Dist.
LEXIS 31501 at *11 (N.D. Tex. Apr. 30, 2007) ("[w]hen a declaratory judgment
action filed in state court is removed to federal court, that action is in effect
converted into one brought under the federal Declaratory Judgment Act").

shot by the police while attempting to escape arrest.  The court held that the police

officers had established the defense of good faith.  Nonetheless, the plaintiff sought

a declaratory judgment that, but for this defense, the police would be liable.  The

court held that the plaintiff had no standing to seek declaratory relief because none

of his present rights were at stake.  *Id*. at 172.  *See also*, *Brandenfels v. Day*, 316

F.2d 375, 378 (D.C. Cir. 1963)("Appellant may not enter the District Court merely

to vindicate either his feelings or his reputation.")  *Id*.

      In *Alliance for Democracy v. FEC*, 335 F. Supp. 2d 39, 46 (D.D.C. 2004),

the court held the plaintiff lacked standing because "a declaratory judgment in this

case would amount to nothing more than an advisory pronouncement that the

FEC's past conduct was somehow contrary to law."  The court explained that a

case or controversy does not exist unless the relief sought is "capable of redressing

the alleged harm."  *Id.*

      In this case, Teltschik essentially seeks a declaratory judgment finding that

the allegations of the Complaint are true, in the hope that this will remove the

alleged "stigma" associated with the Conciliation Agreement.  See, Teltschik Brief

at 52-53.  But such a finding would have no effect on Teltschik's rights and

obligations under the Conciliation Agreement.  The futility of the requested

declaratory relief is highlighted by the fact that the FEC was not named as a party

to this case.  The trial court could not alter the Conciliation Agreement in any way,

because that would render the FEC an indispensable party under F.R.C.P. Rule 19.
*Adams v. Bell*, 711 F.2d 161, 171 (D.C. Cir. 1983) ("when the relief requested
must, to satisfy plaintiffs' claims, be in derogation of the rights of a person not
before the court, that person is an indispensable party").

Likewise, in this case, the Conciliation Agreement explicitly states that
Teltschik was named only in his official capacity, and the Conciliation Agreement
does not identify any act or omission for which Teltschik was found culpable. The
Conciliation Agreement was obviously not intended to disparage Teltschik's
personal character, and any indirect harm he may have sustained is insufficient to
support a claim for declaratory judgment.

"Public policy favors declaratory judgments (1) when the judgment will
serve a useful purpose in clarifying and settling the legal relations in issue, and (2)
when it will terminate and afford relief from the uncertainty, insecurity, and
controversy giving rise to the proceeding." *Jackson v. Culinary Sch.*, 27 F.3d 573,
578 (D.C. Cir. 1994), *vacated on other grounds*, 515 U.S. 1139 (1995). By
contrast, "one of the most important considerations that may induce a court to deny
declaratory relief is that the judgment sought would not settle the controversy
between the parties." *Swish Mktg., Inc. v. FTC*, 669 F. Supp. 2d 72, 77 (D.D.C.
2009).

Moreover, "[w]here it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers." *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1020 (D.C. Cir. 1991). For example, in *Alliance for Democracy*, 355 F. Supp. 2d at 47, the court declined to enter a declaratory judgment finding that "the FEC took too long to complete its investigation" because this "might bring Alliance subjective pleasure, but it would have no concrete effect on any party."

"There are no dispositive factors to consider in this analysis." *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 2013 U.S. Dist. LEXIS 149387 (D.D.C. Oct. 17, 2013). However, the following factors have been found relevant to the exercise of the district court's discretion: (1) "whether declaratory relief would finally settle the controversy between the parties"; (2) "whether other remedies are available or other proceedings pending"; (3) the convenience of the parties"; (4) "the equity of the conduct of the declaratory judgment plaintiff"; (5) "prevention of procedural fencing"; (6) "the state of the record"; (7) "the degree of adverseness between the parties"; and (8) "the public importance of the question to be decided." *Jackson*, 27 F.3d at 580.

In this case, declaratory relief will not benefit Teltschik or settle any controversy because it will not alter the present rights, obligations, or legal status of any party. Moreover, Teltschik did not include the FEC as a party in this suit.

52

The remaining factors do not weigh for or against declaratory relief. Therefore, even if Teltschik had standing to seek declaratory relief, the trial court certainly did not abuse its discretion by dismissing the claim for declaratory judgment. The dismissal of the request for declaratory relief should be affirmed.

## VI.   THE TRIAL COURT PROPERLY EXCLUDED EXHIBITS AT THE PRETRIAL CONFERENCE

Teltschik challenges certain rulings made by the trial court at the pretrial conference concerning the admissibility of documents included on Teltschik's exhibit list. This Court reviews a trial court's evidentiary rulings for abuse of discretion and, even if it finds error, will not reverse an otherwise valid judgment unless appellant demonstrates that such error affected his substantial rights. *Bowie v. Maddox*, 642 F.3d 1122, 1134 (D.C. Cir. 2011).

### A.   The Prior Ruling Striking Allegations Directly Related to the Excluded Evidence

After discovery closed, the Attorneys filed a Motion for Summary Judgment attacking all of the claims in the Complaint. Dkt #40. Jt. App. ___. In his Opposition, Teltschik included a number of new allegations that had not been alleged in the Complaint.

The Attorneys moved to strike six of these new allegations from Teltschik's

Opposition, two of which are highly relevant to the trial court's evidentiary ruling

challenged by Teltschik.

> 3.    That any defendant could be held liable to Teltschik
>       based on some accusation of forgery, unrelated to MUR
>       5675;
>
> 4.    That any defendant could be liable for filing reports
>       electronically in his name or as "Treasurer;"

Dkt. #48 at pp. 2-3.  Jt. App. ___.    In response, Teltschik filed a "Response to

Defendants' Motion to Strike Plaintiff's Unpled Theories or, in the Alternative,

Motion to Amend Pleadings."  Dkt. #52.  Jt. App. ___.  The Motion to Amend

sought to add these new allegations to the Complaint as "causes of action."  *Id*. at

3.  Jt. App. ___.

On February 12, 2010, Judge Kennedy issued a Memorandum Opinion

addressing the Attorneys' Motion for Summary Judgment and Motion to Strike, as

well as Teltschik's Motion to Amend.  Dkt #55.  Jt. App. at ___.  As to the Motion

to Strike, Judge Kennedy noted that a plaintiff may not assert new allegations at

the summary judgment stage if such allegations amount to a "fundamental change"

in the nature of plaintiff's claims.  *Id*. at 7.  Jt. App. ___.

The trial court ruled that, among others, allegations 3 and 4 fundamentally

changed the nature of Teltschik's claims and therefore ordered them stricken.  *Id*.

As to alleged forgery, the trial court noted that, "Teltschik's complaint, however, focuses on defendants' activities associated with MUR 5675 and the Conciliation Agreement that resulted from that MUR." *Id*. at 9.  The trial court ruled, "Teltschik may not now expand defendants' alleged wrongdoings to include the forging of documents filed with the FEC that occurred long before the FEC opened MUR 5675. " *Id*.  As to the misappropriation of his name, the trial court ruled:

> Similarly, the sole basis of the misappropriation of name and reputation claim pled in Teltschik's complaint is defendants' alleged action of entering into a Conciliation Agreement on his behalf without his consent. Thus, the subsequent assertion of an additional ground for misappropriation of name—the use of Teltschik's name on other FEC filings without his authorization—amounts to a fundamental change in the nature of Teltschik's misappropriation of name and reputation claim.

*Id*.  Teltschik has not appealed the ruling striking these allegations.

Judge Kennedy also denied Teltschik's Motion to Amend his Complaint, noting that Teltschik failed to offer any grounds for leave to amend and that he failed to attach a proposed amended Complaint as required by local rules. Teltschik has not appealed this ruling, either.  At the Pretrial Conference, the Attorneys objected to any exhibits offered for the purpose of proving that any of the Attorneys had engaged in forgery or that the Attorneys had filed reports electronically in Teltschik's name or as "Treasurer."  As to forgery, the trial court

read the ruling cited above and sustained the Attorneys' objection.  Transcript of

June 20, 2012 at 25-26.  Jt. App. at ___.

      B.     The Trial Court Properly Excluded This Evidence

     This ruling was correct.  The trial court had already ruled that these

allegations of forgery were not relevant to the claims in the Complaint and could

not be added as new claims.  Having not appealed that ruling, Teltschik cannot

complain that it was properly applied when ruling on the relevance of trial exhibits.

> Evidence is relevant if:
>
> (a) it has any tendency to make a fact more or less
> probable that it would be without the evidence; and
>
> (b) the fact is of consequence in determining the action.

Fed. R. Ev. 401.

     Teltschik has failed to explain why the trial court was wrong when it ruled

that alleged forgery of documents signed well before the execution of the

Conciliation Agreement proved any issue related to the execution of that

Agreement.  Ms. Kelley did not sign Teltschik's name to the Conciliation

Agreement.   The effect of signing her own name "For the Respondents" on the

Conciliation Agreement is not affected by whether or not his name was or was not

improperly signed to separate "documents filed with the FEC that occurred long

before the FEC opened MUR 5675."  Dkt #55 at 9.  Jt. App. ___.

Teltschik concludes his argument with the blanket assertion that, "These documents are all documents that are relevant to the negligence of the Appellees and their breaches of duty to Mr. Teltschik." Teltschik Brief at 56. Yet he fails to connect these documents to the only act that is the subject of his alleged claims of negligence and breach of fiduciary duty. It is for precisely this reason that trial court struck these allegations for Teltschik's Opposition to the Motion for Summary Judgment, and refused to allow them to be offered at trial.

Teltschik's reliance on FRE 406 adds nothing to his argument. While evidence of custom or habit may have been available to prove a breach of the standard of care with respect to the signing of the excluded documents, Teltschik fails to make the essential connection between those documents and the Conciliation Agreement.

Teltschik cites two cases in support of this argument. In *Colorado Milling & Elevator Co. v. Terminal R. Assoc.*, 350 F.2d 273 (8th Cir. 1965), the court ruled that evidence relating to the custom of visually inspecting a brake mechanism on a train was relevant to determining the standard of care applicable to such inspections. Similarly, in *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178 (5th Cir. 1975), the court ruled that evidence that landing procedures recommended in the circulars were generally followed was relevant to determining the standard of care applicable to such procedure. In both cases, the custom was

57

presumably consistent with and evidence of the standard of care. These cases have

no application to the issue presented here unless Teltschik proposes to argue at trial

that the forging of signatures is consistent with and relevant to the standard of care.

Moreover, the standard of care in signing the allegedly forged documents is not an

issue in the case, as clearly determined by the trial court in granting the Attorneys'

Motion to Strike.

As to the misappropriation of signatures, the trial court appeared initially to

agree with the Attorneys' objection, *Id*. at 15/18 – 17/1, but then seemed to rule

that Teltschik could at least ask about the documents. *Id*. at 17/14 – 17/23. The

trial court's major concern appeared to lie in the introduction of hundreds of

documents to prove the same thing. *Id*. at 17/23 – 17/24. On the other hand, she

appeared to reserve on the question of relevance. *Id*. at 18/3 – 18/8. Assuming

that to be true, Teltschik's appeal of this point is premature. Even if the Court

reads the transcript to say that the trial court excluded these documents on grounds

of relevance, the same arguments apply as to the allegations of forgery. The filing

of reports electronically in Teltschik's name or as "Treasurer" has no relevance to

the signing of the Conciliation Agreement.

The Attorneys respectfully requests that these evidentiary rulings be

affirmed.

## VII.   CONCLUSION

For the foregoing reasons, the Attorneys respectfully request that the rulings

challenged by Teltschik be affirmed in all respects.

Respectfully submitted,

JORDAN COYNE & SAVITS, L.L.P.

By:   / s / John Tremain May
    John Tremain May      Bar #29204
    1100 Connecticut Avenue, NW
    Suite 600
    Washington, DC  20036
    Telephone:  202-496-2805
    Fax:  202-496-2800
    E-mail:  jmay@jocs-law.com

*Counsel for Defendants-Appellees, Williams
& Jensen, PLLC, Williams & Jensen, P.C.,
Barbara Wixon Bonfiglio and Meredith G.
Lesher (formerly Kelley)*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)

I hereby certify that the required elements of this brief comply with the type-volume limitation in FRAP 32 (a)(7)(B) and that those elements contain 13,737 words, according to the Microsoft Word program on which it was prepared.

 /s/ John Tremain May
John Tremain May # 29204.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Consent Motion To Extend Briefing Deadlines was electronically filed and served this 4th day of November, 2013 upon:

Leonard Thomas "Butch" Bradt, Esquire
Suite 1950
5151 San Felipe
Houston, TX  77056

/ s / John Tremain May
John Tremain May